**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

HOMEMAKERS REAL ESTATE,
LLC,

Debtor.

Case No. 6:25-bk-02685-GER
Chapter 11

_____/

**MOTION TO VACATE ORDER DISMISSING CASE**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)(3)**
**BASED ON NEWLY-DISCLOSED MISREPRESENTATION BY**
**KENNETH G. DIXON**

Mr. Horton S. Johnson, by and through undersigned counsel, moves this

Court under Federal Rule of Civil Procedure 60(b)(3), made applicable to this case

by Federal Rule of Bankruptcy Procedure 9024, to vacate the Order Dismissing

Case (Doc. 73) entered June 27, 2025. The Order rests on Mr. Kenneth G. Dixon's

under penalty of perjury representation that the January 9, 2024 Assignment of

Membership Units was an absolute, "total" transfer with "no return to Johnson."[1]

---

[1] Mr. Timko — speaking for PEDIXON LLC and ZPD LLC — repeatedly represented to the Court, on the record, that the January 9, 2024 Assignment was a complete and final transfer of Mr. Johnson's entire membership interest, expressly disclaiming any security or collateral characterization. These representations heralded and augmented the "total/no return" characterization that Mr. Dixon later declared to in Doc. 69, and they are flatly inconsistent with Mr. Timko's May 5, 2026 representation that the Assignment "would have been returned" upon repayment. Specifically, Mr. Timko stated:

> **Hearing Tr. 19:6–10:** _"Mr. Johnson assigned his interest in the Debtor, and that's the assignment that's at issue today. ... in it he assigns all of his rights, title, and interest in the Debtor as the sole member."_

> **Id. at 21:11–18:** _"the signed assignment dated January 9th, 2024, states that he is, quote, the sole owner and holder of all the issued and outstanding membership units of the Debtor, unquote. And he_

On May 5, 2026, Mr. James A. Timko, Esq, as counsel for Mr. Dixon and his affiliated entities —— disavowed Mr. Dixon's earlier representation, confirming instead that Homemakers Membership Units, "would have been returned" upon repayment of the underlying obligation. [2] (Exhibit A)(response to Civil Theft

---

does now assign to the Trust all of my right, title, and interest in all issued and outstanding membership interests of the Debtor."

**Id. at 21:19–25:** "In other words, he transferred his entire transferable interest as the sole member and is no longer a member of the entity, because even under the statute cited to by Mr. Wolff in his response, he was disassociated under Section 605.0602 of the Florida statutes. And that language is not ambiguous ... ."

**Id. at 22:11–13:** "Under Olmstead, an assignment, quote, is accomplished through a simple assignment of the sole member's interest to the transferee, unquote."

**Id. at 22:15–19:** "Mr. Johnson having assigned his right and title interest in the Debtor would not have a percentage interest to vote, and therefore he didn't have authority to place the entity into bankruptcy."

**Id. at 42:13–16:** "Mr. Johnson assigned all of his — his transferable rights to the Trust. So Mr. Johnson no longer has anything. The beneficial interest was gone, and the property was gone."

**Id. at 43:4–11:** "What we have is an agreement to temporarily forebear. Mr. Johnson walked away from his — all of his interest in Homemakers. ... Mr. Johnson's voting rights were lost when there's been a transfer of the person's entire [transferable interest] in the company."

**Id. at 43:12–14:** "There's no evidence anywhere, there's no document anywhere, that this was for a security purposes. There is evidence that it was for a forbearance purposes."

**Id. at 43:20–24:** "And the fact that it wasn't in the initial collateral package, and it was a separate deal with Mr. Johnson, underlines that this was a full and complete assignment. Mr. Johnson has no rights to control anymore of the property."

**Id. at 44:20–22:** "Mr. Johnson owns nothing and doesn't have the right to control Homemakers."

**Id. at 45:13–14:** "But Mr. Johnson is out of the picture. He assigned his entire interest."

**Id. at 46:7–9:** "Mr. Johnson's out of the picture is my point. The Trust controls Homemakers."

**Id. at 48:15–19:** "I don't believe that you can have an oral mortgage on property. ... they're claiming that this is some sort of oral collateral agreement, which it wasn't. It was an assignment of the interest in the — in the entity."

**Id. at 49:8–14:** "it's assigned to the Trust, and Homemakers is the — not Mr. Johnson — is the beneficiary of the Trust ... . So Mr. Johnson didn't have the right to put this entity into bankruptcy."

---

[2] Dixon lent $11,225,000 to six entities by September 2023, and the evidence shows Dixon received in-cash or in-kind $11,363,595 plus all fees and interest due by December 2023_in other words, Dixon's claims were fully

Letter). As grounds for vacating this Court's Dismissal Order. (Doc. 73). Mr. Johnson states the following.

**Although a Motion to Vacate (Doc. 88) is pending, this Motion stands on its own grounds; the Court may rule on it together with the pending Motion to Vacate (Doc. 88) or separately.**

The Motion to Vacate filed at Doc. 88 on March 26, 2026 is presently before this Court under Federal Rules of Civil Procedure 60(b)(1) and 60(d)(3) and is fully briefed.

This Motion is independent of Doc. 88. It rests on Federal Rule of Civil Procedure 60(b)(3) on grounds that did not exist when Doc. 88 was filed. The May 5, 2026 letter from Mr. Timko post-dates Doc. 88 by approximately six weeks.

The Court may rule on this Motion separately or in conjunction with Doc. 88 on whatever procedural schedule it finds most efficient. Mr. Johnson seeks vacatur on either path.

**The dismissal order turned on Ken Dixon's factual representation made after Homemakers presented a statutory-mortgage theory to support Horton Johnson's authority to have Homemakers file a Chapter 7. The factual statement (made under) penalty of perjury has now been disavowed by Respondents' own counsel.**

---

satisfied by the end of 2023. If the May 5, 2026 letter is taken at face value, Homemakers should be returned. (Exhibit D)(Reports on Dixon loans and Payments).

3

On May 5, 2025, Homemakers Real Estate, LLC, filed a voluntary Chapter 11 petition signed by Mr. Johnson as sole member. The docket sequence that followed is dispositive.

May 8, 2025 — Doc. 12. PEDIXON LLC and ZPD LLC (collectively, with Mr. Kenneth G. Dixon, "Respondents"), through Mr. Timko, filed the Motion to Dismiss Bankruptcy Case for Lack of Corporate Authority. The motion argued that a January 9, 2024 Assignment of Membership Units conveyed "all of [Mr. Johnson's] right, title and interest" as a matter of document interpretation.

May 23, 2025 — Doc. 24. The Debtor, through Mr. Frank M. Wolff, Esq., filed its Response. At paragraphs 24 through 26, Mr. Wolff raised the alternative theory that the Assignment, regardless of its facial form, operated as a security device, citing Fla. Stat. § 605.0602(5)(b)(1) (the "transfer for security purposes" carve-out from dissociation) and In re Windham Power Lifts, Inc., 91 B.R. 595 (Bankr. M.D. Ala. 1988).

June 11, 2025 — Hearing (Doc. 63). Mr. Wolff read Fla. Stat. § 697.01 verbatim into the record. (Doc. 63) (Hearing Tr. at 35:5–15 (June 11, 2025)). He read Fla. Stat. § 697.02 into the record. (Id. at 35:19–22). He cited the security-purposes carve-out at § 605.0602(5)(b)(1). (Id. at 36:16–20). He cited Windham Power Lifts. (Id. at 41:14–15). He invoked the equity-of-redemption doctrine. Id.

at 39:17–24. He articulated the form-versus-substance principle. (Id. at 38:9–12). The Court directed the parties to file supplemental pleadings.

June 24, 2025 — Doc. 69. Thirteen days after the hearing, and six and a half weeks after the original Motion to Dismiss, Respondents through Mr. Timko filed the Supplemental Pleading in Support of Motion to Dismiss. Embedded in it, for the first time anywhere on the docket, was Mr. Dixon's verified declaration. Mr. Dixon swore at paragraphs 11 through 14 that the January 9, 2024 Assignment was "total" and "absolute," with "no return to Johnson" upon any event. Mr. Dixon's verified statement was made with full knowledge that Mr. Wolff had, two weeks earlier, placed § 697.01 and the security-characterization theory directly before the Court.

August 26, 2025 — Doc. 85. The Court entered the Order Denying Motion to Reconsider. It held that the Assignment "…the trustee of the Tiered Land Trust was the only person with authority to direct Homemakers to file a bankruptcy petition..." Doc. 73, p. 4. It held further: "Debtor has not cited to any other law that would support its contention that the Assignment did not convey all rights attendant to the Membership Units that were conveyed to the Land Trust." (Id. at n. 22)((Inskeep v. Baccus Global, LLC, 2024 WL 416357 (S.D. Fla. Feb. 5, 2024), and Olmstead v. F.T.C., 44 So. 3d 76 (Fla. 2010)) Together these cause the Court totreat the absolute-transfer characterization as established.

5

May 5, 2026 — (Exhibit A)(the Timko letter). Mr. Timko, the same lawyer who prepared and filed the Doc. 69 supplemental pleading containing Mr. Dixon's verified declaration, sent Mr. Matthew A. Leibert, Esq., a letter on Dean Mead letterhead. The letter states that the January 9, 2024 Assignment "would have been returned" upon repayment of the underlying obligation. (Exhibit A). That representation cannot coexist with Mr. Dixon's "total/no return" verified statement. One of the two is a misrepresentation of Mr. Dixon's actual state of mind on January 9, 2024.

**Frank M. Wolff, Esquire raised the equitable-mortgage and security-assignment theory at the June 11, 2025 hearing, on the record, with statutory and case-law citations.**

The legal theory Dixon now advances to avoid civil theft liability — is that the January 9, 2024 Assignment operated as a security device subject to recharacterization under Fla. Stat. § 697.01 as a mortgage. The concept is not new. Homemakers raised it previously and it was briefed in part at Doc. 24 ¶¶ 24–26, argued orally on the record at the June 11, 2025 hearing (Doc. 63)(Id), and rejected primarily because the record contained an under penalty of perjury statement from Mr. Dixon that his understanding of the transfer was different, that the assignment was absolute). Such an admission, by Respondents or their counsel then. That the parties intended the Assignment as a defeasance device, should have altered the results of the motion to dismiss.

6

The transcript—of—the June 11, 2025 hearing establishes that Mr. Wolff raised the theory with specificity:

First, Mr. Wolff read Fla. Stat. § 697.01 verbatim into the record: "All conveyances, obligations conditioned or defeasible, bills of sale or other instruments of writing conveying or selling property, either real or personal, for the purpose or with the intention of securing the payment of money . . . shall be deemed and held mortgages." (Id. at 35:5–15).

Second, Mr. Wolff read Fla. Stat. § 697.02 into the record: "A mortgage shall be held to be a specific lien on the property therein described, and not a conveyance of the legal title or the right of possession." (Id. at 35:19–22).

Third, Mr. Wolff cited Fla. Stat. § 605.0602(5)(b)(1)'s "transfer for security purposes" carve-out: "Well, this is a transfer for security purposes. Mr. Timko's argument makes that clear. They had a Loan Agreement. They needed another $750,000. So they set up this Trust to further secure that obligation." (Id. at 36:16–20.)[3]

Forth, Mr. Wolff articulated the form-versus-substance principle: "even if the instrument looks like a deed, if it is secured property, that is a mortgage, and that's the reason the mortgage statute exists." (Id. at 38:9–12).

_____

[3] Mr. Timko's rebuttal at the same hearing reinforced the absolute-transfer characterization he now disavows: "Mr. Johnson made a deal with my clients that he would assign all of his interests in Homemakers, okay, which he did. It's not a dispute anymore. So he assigns all of his interests in Homemakers. Mr. Johnson is not a beneficiary under the Trust. Homemakers is ... and Mr. Johnson assigned all of his — his transferable rights to the Trust. So Mr. Johnson no longer has anything. The beneficial interest was gone, and the property was gone." Tr. at 42:6–16.

**The Court rejected Mr. Wolff's theory because the face of the Assignment recited an absolute, unconditional transfer and the record contained no admission of contrary intent.**

The Assignment of Membership Units dated January 9, 2024 recites that Mr. Johnson "do[es] now assign the following . . . all of my right title and interest in and to all of the issued and outstanding membership units of Homemakers Real Estate LLC." (Exhibit B). It contains no defeasance or reversionary clause. It does not reference an underlying debt. It does not reserve a right of return upon repayment.

Now, Mr. Timko argues (contrary to his earlier position) that Florida law recharacterizes such an instrument as a mortgage where the parties intended it to secure a debt. Fla. Stat. § 697.01(1). But the recharacterization analysis turns on the parties' intent — a fact question. *Marina Funding Group v. Peninsula Property Holdings*, 950 So. 2d 428, 428 (Fla. 4th DCA 2007) ("[t]he form of an instrument is not controlling"). Without admissions or extrinsic evidence of contrary intent, a court applying § 697.01 to a facially absolute instrument is left with only the four corners. That is precisely the posture in which the June 27, 2025 Order issued.

**At the Court's behest, under penalty of perjury, Mr. Dixon's declared the assignment was an absolute transfer made as payment for a forbearance of collection action. If Dixon had declared otherwise adversarial testing would have been required to ascertain Dixon's intent and understanding.**

On June 24, 2025, Respondents filed a Supplemental Pleading in support of dismissal (Doc. 69), attaching the sworn Declaration of Kenneth G. Dixon (the "*Dixon Declaration*")(Id at Exhibit C). The same Declaration was refiled in 6:25-bk-05570-GER as Exhibit "A" to Doc. 7. The Dixon Declaration provides:

> ¶ 12. "*At this meeting, Mr. Amodeo suggested that Mr. Johnson would be willing to relinquish all interest in Homemakers to obtain a forbearance of legal action under and enforcement of Mr. Johnson's personal guaranty. ... The parties agreed that the Assignment would be a total assignment of the interests with no return to Johnson.*"

> ¶ 13. "*On January 9, 2024 ... Johnson executed the Assignment and in exchange therefor, PEDIXON LLC agreed to a six (6) month forbearance of the Loan.*"

> ¶ 14. "*I decided that the interests in Homemakers would be held in the Trust because it was a total assignment and the Trust would own Homemakers ....*"

Mr. Dixon made those statements under penalty of perjury. The logic behind the Court finding Mr. Johnson lacked authority relied on these statements, that is, when finding that the Assignment transferred ownership of Homemakers to the so-called Tiered Land Trust dated September 13, 2023, the Court presumed the Assignment was absolute.

**Mr. Timko's prior briefing adopted the same characterization.**

Mr. Timko, as counsel for Respondents, repeatedly adopted and reinforced Mr. Dixon's characterization in his own briefing. (Supra at n.1) The most direct

restatement appears in Respondents' *Objection to Tiered Capital, Inc.'s Motion for Reconsideration of the June 27, 2025 Order Dismissing Case* (Doc. 79, p. 1).

> *" Mr. Dixon also confirmed the assignment was a total assignment of Mr. Johnson's interest and thus, not to be returned upon satisfaction of the loan."*

Mr. Timko made the same representation in his *Reply in Support of Motion to Dismiss for Lack of Corporate Authority* (Doc. 35 at 1). He described the assignment as transferring *"all of [Johnson's] 'right, title and interest' in the Debtor and 100% of the profits to the Trust"* so that *"the Trust is the sole member."* In footnote 2, of that same reply, Mr. Timko explained the Assignment's consideration as *"a brief forbearance with respect to suing on Mr. Johnson's guaranties."* (Id at n.2).Mr. Timko has continued the same characterization in subsequent filings in the related cases. *See, e.g.,* In re Homemakers Real Estate, LLC, 6:25-bk-05570-GER (Docs. 19, 184, 188).

**On May 5, 2026, in staving off civil theft penalties, Respondents' counsel admitted that his Dixon-related clients had a contrary intent, then articulated in the bankruptcy proceedings. Specifically, they only intended to hold the Homemakers units as collateral to ensure others paid debts to the Dixon lenders. That admission was intentionally missing from the June 11, 2025 record in order to avoid the conclusion that Johnson could authorize the bankruptcy.**

The May 5, 2026 letter from Mr. Timko states that the January 9, 2024 Assignment "would have been returned" upon repayment of the underlying obligation. (Exhibit A).

That admission cannot be reconciled with Mr. Dixon's verified statement that the Assignment was "total" with "no return to Johnson." (Doc. 69 ¶¶ 11–14). One of the two statements is a misrepresentation of Mr. Dixon's actual state of mind on January 9, 2024. The May 5, 2026 admission is the one that places the Assignment within § 697.01's express ambit.

The May 5, 2026 admission is as binding on Mr. Dixon and on PEDIXON LLC and ZPD LLC as Mr. Dixon's own declarations. Mr. Timko was authorized counsel acting within the scope of his representation. FRE 801(d)(2)(B) and (D); Hanson v. Waller, 888 F.2d 806, 814 (11th Cir. 1989) (holding that statements made by an attorney within the scope of his employment may be admissible against the party retaining the attorney).

**Had Mr. Dixon's admission been on the record at the June 11, 2025 hearing, the Court would either have ruled for the Debtor on Mr. Wolff's preserved equitable-mortgage theory, or at a minimum would have been required to convene an evidentiary hearing on the absolute-versus-conditional question.**

The premise of the dismissal was that the record contained no support for Mr. Wolff's contention that the Assignment did not convey "all rights." (Doc. 73,

11

p. 4). The May 5, 2026 letter is exactly that support, from the most authoritative possible source — Respondents' own counsel.

If the record is corrected to include Mr. Dixon's newly admitted intent, two outcomes are possible on the corrected record. Both foreclose dismissal.

Initially the Court would have applied Fla. Stat. § 697.01 and recharacterized the Assignment as a security device. Under § 697.02, a mortgage "shall be held to be a specific lien . . . and not a conveyance of the legal title." Under Fla. Stat. § 605.0602(5)(b)(1), a "transfer for security purposes" does not dissociate the member. Under Fla. Stat. § 605.0502(3)(a), even an absolute transfer of a transferable interest does not entitle the transferee to manage. Under Article 9 of the Florida UCC, Fla. Stat. § 679.1091(1)(a), Chapter 679 applies to any "transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." In such a transaction, the secured party holds only a security interest, and may obtain ownership of the collateral, if at all, only through a commercially reasonable disposition after default under §§ 679.610– .614, following the notice requirements of § 679.611, or through a valid acceptance of collateral in full or partial satisfaction under § 679.620. None of those Article 9 remedies occurred On any of these statutory paths, Mr. Johnson remained the member with authority to sign the Resolution authorizing the bankruptcy filing.

Alternatively, at a minimum, a contemporaneous Respondent admission of conditional assignment intent would have made an evidentiary hearing on the absolute-versus-conditional question mandatory. Courts do not resolve § 697.01 recharacterization disputes on the four corners of the instrument when the parties' intent is contested by record evidence. The Court could not, on the corrected record, have applied Olmstead Inskeep substitution as a matter of law.

Either path forecloses the dismissal that issued. The Dismissal Order cannot stand on the corrected record. (Doc. 73).

The strategic timing of Mr. Dixon's verified declaration sharpens the Rule 60(b)(3) analysis. Mr. Dixon did not swear the "total/no return to Johnson" representation before the legal stakes were known. He swore it on June 24, 2025, thirteen days after Mr. Wolff read § 697.01 verbatim into the record at the June 11, 2025 hearing, after Mr. Wolff invoked the equity-of-redemption doctrine, and after the Court had ordered supplemental briefing on the precise question Mr. Wolff's theory raised. The verified statement was filed in direct response to a live, articulated, on-the-record contention that the transaction was a security device. A verified representation made under those circumstances — targeting the one factual element § 697.01 turns on, with full knowledge of materiality — is not a careless paraphrase. It is a precision-targeted denial of the truth, made to procure a favorable ruling on a contested legal theory. That the "absolute transfer" is a self-

serving, post hoc idea that is now supported by the contrary admission in response to civil theft allegations.

**The evidentiary hearing the Court would have been required to convene calls Mr. Kenneth G. Dixon and Mr. Frank L. Amodeo.**

The two witnesses are the ones that Mr. Dixon purports discussed the purpose of any Johnson assignment of Homemakers. (Doc 69 at 9-10). The two witnesses are necessary for the absolute-versus-conditional question, both witnesses stand ready to testify.

Mr. Kenneth G. Dixon. Mr. Dixon is the principal of PEDIXON LLC and ZPD LLC. He is the author of the verified declaration at Doc. 69 ¶¶ 11–14, in which he swore the Assignment was "total" with "no return to Johnson." He is the client whose counsel, on May 5, 2026, wrote that the Assignment "would have been returned" upon repayment. Both statements cannot be true. Mr. Dixon's testimony — under oath, subject to cross-examination — is the only direct evidence of his state of mind on January 9, 2024.

Mr. Frank L. Amodeo. Mr. Amodeo is not merely a witness to the January 9, 2024 transaction. Amodeo was a participant in it. He reviewed the documents Respondents' counsel presented to Mr. Johnson and rejected them as facially deficient since the documents would have caused Johnson to transfer Homemakers to Dixon. Amodeo told Pitkanen (counsel for both Mr. Dixon and Mr. Johnson)

14

that revisions had to be made before Mr. Johnson could sign. Pitkanen agreed to make those changes in order to protect Johnson's interest. Hence, Amodeo is a percipient witness to the parties' contemporaneous understanding of the transaction's purpose and to the negotiated exchanges that bear on intent under § 697.01.Particularly, since Pitkanen's changes apparently failed to accomplished what Pitkanen purported the changes would do.

**Rule 60(b)(3) authorizes vacatur where dismissal is procured by misrepresentation of a material fact, and that standard is met here.**

Federal Rule of Civil Procedure 60(b)(3) authorizes vacatur for "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Federal Rule of Bankruptcy Procedure 9024 makes Rule 60 applicable to this case. The motion is timely under Rule 60(c)(1); the one-year period runs from June 27, 2025 and expires June 27, 2026.

The standard requires the moving party to prove by clear and convincing evidence that "the adverse party obtained the verdict through fraud, misrepresentation, or other misconduct" and that "the conduct prevented the losing party from fully and fairly presenting his case." Cox Nuclear Pharmacy, Inc. v. CTI, Inc., 478 F.3d 1303, 1314 (11th Cir. 2007). Both elements are satisfied.

The misrepresentation. Mr. Dixon's verified declaration at Doc. 69 ¶¶ 11–14 — that the Assignment was "total" with "no return to Johnson" — was a

15

misrepresentation of material fact. Respondents' own counsel has now admitted, in writing, that the Assignment "would have been returned" upon repayment. (Exhibit A). The admission disavows the Respondents' earlier characterization as "total." (Id).

The materiality. The misrepresentation was material. It was the precise factual representation on which the Court rested the absolute-transfer premise. (Doc. 73, pp. 2, 4 and n. 22). Without it, the Olmstead/Inskeep substitution rule has no purchase. With it, the substitution rule is dispositive.

The prevention of full and fair presentation. The misrepresentation prevented the Debtor from fully and fairly presenting its case. Mr. Wolff raised the equitable-mortgage theory at the June 11, 2025 hearing. The Court rejected the theory because the record contained no admission of contrary intent. Mr. Dixon's true state of mind — now established by his own counsel — was the missing piece. Had it been disclosed truthfully, Mr. Wolff's theory should have prevailed. But if not granted immediately, then the presentation would have triggered the need for an evidentiary hearing ,where the parties true intent could have been gleaned.

**Footnote 22 of the Order Dismissing Case does not bar this Motion.**

Respondents may argue that Mr. Wolff's on-the-record concession at the June 11, 2025 hearing — that "for purposes of this hearing . . . [Trustee] ha[s] a lien on the stock," Tr. at 40:7–9 — forecloses challenge to the absolute-transfer

16

characterization. It does not, because if Messrs. Timko and Dixon had told the truth and disclosed Dixon's true intent, then there would have been no concession.

Anyway, Mr. Wolff's concession was, by its own terms, "for purposes of this hearing" and was framed as a concession of execution and lien — i.e., a security characterization, not an absolute-transfer characterization. (Tr. at 34:13–14, 40:7–9). He preserved the legal-effect contest throughout, repeatedly invoking § 697.01 and § 605.0602(5)(b)(1).

Furthermore, Rule 60(b)(3) targets misrepresentations of fact by the adverse party, not procedural concessions by the moving party. A litigant's concession on a hearing record cannot insulate an opposing party's verified misrepresentation from later challenge under Rule 60(b)(3).

Nor does the "could have been raised earlier" rule apply. The May 5, 2026 letter post-dates the June 27, 2025 dismissal by more than ten months. The factual predicate for this Motion was not available at the time of the dismissal, because Mr. Timko and Mr. Dixon fabricated a different explanation, which served them better. Thus, the true intent could not have been raised earlier.

The May 5, 2026 letter now supports Homemakers' original legal theory that the assignment was an equitable mortgage under § 697.01 —an argument raised at the June 11, 2025 hearing.

**The May 5, 2026 letter is admissible as a statement of a party-opponent and as impeachment of Mr. Dixon's verified declaration.**

The May 5, 2026 letter is admissible against Respondents as a statement of a party-opponent. FRE 801(d)(2)(B) (statement adopted by the party); FRE 801(d)(2)(D) (statement by the party's agent on a matter within the scope of the agency). Mr. Timko is the attorney of record for Crescent Sound, Ltd., PEDIXON LLC, and ZPD LLC in this case and the related cases. His statement on Dean Mead letterhead about the very transaction at the heart of the dismissal is well within the scope of his representation. Mr. Timko's agency is strengthened by the fact that the same lawyer — Mr. Timko — who prepared and filed the Doc. 69 supplemental pleading containing Mr. Dixon's verified declaration, is the lawyer who, on May 5, 2026, wrote the contradicting letter on Mr. Dixon's behalf. The May 5, 2026 admission is therefore not merely a party-opponent admission; it is an admission by the same agent who prepared and filed the verified statement now being disavowed. (Bankr. R. 9011).

The letter is also admissible as impeachment of Mr. Dixon's verified declaration under FRE 613(b).

The settlement-privilege rule of FRE 408 does not bar admission. FRE 408 bars the use of compromise offers to prove the validity or amount of a disputed claim. The May 5, 2026 letter is offered for an impeachment and recharacterization

18

purpose, not to prove liability or amount of claim — the express carve-out under FRE 408(b).

## RELIEF REQUESTED

For the reasons stated, Mr. Horton S. Johnson respectfully requests that this Court:

1.     Vacate the Order Dismissing Case (Doc. 73, Case No. 6:25-bk-02685-GER) entered June 27, 2025, pursuant to Federal Rule of Civil Procedure 60(b)(3) made applicable by Federal Rule of Bankruptcy Procedure 9024;

2.     Reinstate the voluntary Chapter 11 case;

3.     Consolidate all three bankruptcy filings and appoint a Chapter 11 trustee (presumably Arvind Mahendru).

4.     Convene an evidentiary hearing on whether the January 9, 2024 Assignment of Membership Units was an absolute transfer or a conditional collateral assignment, with Mr. Kenneth G. Dixon and Mr. Frank L. Amodeo as witnesses;

5.     In the alternative, rule on this Motion together with the pending Motion to Vacate (Doc. 88) on whatever procedural schedule the Court finds most efficient; and

6.     Grant such further relief as the Court deems just and proper.

Respectfully submitted this 10th day of May, 2026,

/s/ Matthew A. Leibert
Matthew A. Leibert, Esq.
Florida Bar No. 0752266
5782-A South Semoran Boulevard
Orlando, Florida 32822
Telephone: (407) 245-8352
Facsimile: (407) 245-8361
Email: leibert@urbanthier.com
*Counsel for Movant  Horton Johnson*

## EXHIBITS

Exhibit A — Letter from Mr. James A. Timko, Esq., to Mr. Matthew A. Leibert, Esq., dated May 5, 2026.

Exhibit B — Assignment of Homemakers Membership Units to the Tiered Land Trust.

Exhibit C — Verified Declaration of Mr. Kenneth G. Dixon (Doc. 69),

Exhibit D — Dixon Repayment Report.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 10th, 2026, I electronically filed the foregoing with the Clerk of Court through the CM/ECF system.

/s/ Matthew A. Leibert

MATTHEW A. LEIBERT, Esquire

# EXHIBIT A

**Letter from James A. Timko, Esq., to Matthew A. Leibert, Esq., dated May 5, 2026 (Re: Response to Civil Theft Demand)**

*On letterhead of Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A. —
bearing internal reference No. 6388205.v1 — three pages.*

*In re Homemakers Real Estate, LLC*
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)
Motion to Vacate (Doc.  )

# DEAN|MEAD

**Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A.**
420 South Orange Avenue, Suite 700
P.O. Box 2346
Orlando, FL 32801

**Attorneys and Counselors at Law**
Orlando
Fort Pierce
Naples
Viera/Melbourne
Vero Beach

(407) 841-1200
(407) 423-1831 Fax
www.deanmead.com

**JAMES A. TIMKO**
407-613-2588
JTimko@deanmead.com

May 5, 2026

Via Email Leibert@urbanthier.com and U.S. Mail

Mr. Matthew A. Leibert, Esq.
Law Office Matthew A. Leibert
5782A S. Semoran Blvd.
Orlando, FL 32822

Re:    Response to Civil Theft Demand

Dear Mr. Leibert:

This letter is being sent on behalf of Kenneth Dixon and his related entities in response to your letter dated April 6, 2026.

My clients deny any wrongdoing with respect to the assignment of Mr. Johnson's membership interest in Homemakers and deny the arguments asserted in your letter. Mr. Johnson signed the assignment of his interest in Homemakers voluntarily and for consideration.

In addition, Mr. Johnson's claim fails for an obvious reason. The interest in Homemakers was placed in the Tiered Trust. If the debts owed to Pedixon and ZPD were paid, the interest would have been returned. As a result, there was never any intent to permanently deprive Mr. Johnson of his interest. Indeed, we have attempted to resolve this dispute and included in our proposal the return of Mr. Johnson's interest in Homemakers.

Your claim that Mr. Johnson's interest in Homemakers had a value of $8,981,897.00 is not supported by any accepted valuation standard. By way of background, as you are aware, prior to Mr. Johnson assigning his interest in Homemakers to the Tiered Trust, Homemakers assigned its ownership of the condominiums and townhomes to the Tiered Trust. That real property was the only asset of Homemakers. Homemakers made that assignment in connection with a series of loans made to Homemakers' related entities and business partners that were already in default and made in connection with the Cape Crossing development. As reflected in the Loan Agreement that Mr.

6388205.v1

May 5, 2026
Page 2

Johnson signed, Pedixon, LLC provided additional funding and agreed to reinstate the notes that were in default to allow Mr. Johnson and his business partners to sell the condominiums and townhomes to pay off their debts.

The valuation presented in your letter does not take into account Homemakers' prior assignment of the real property to the Tiered Trust. It does not take into account Mainstreet's mortgage and other encumbrances that are attached to the real property. For example, two other mortgages encumbered certain condos and townhomes and multiple options were held against several of the properties. In addition, association fees, property taxes and any other unpaid debts are also not reflected in the valuation. Finally, Mr. Johnson's valuation does not take into account that Homemakers was not generating sufficient income to pay its debt service, which is why they agreed to sell the condos and townhomes in the first place. As a result, the value of any equity interest in Homemakers was likely $0.00 not $8,981,897.00.

While you claim that the documentation of the Tiered Trust was deficient, your allegations do not rise to the level of fraud. Mr. Johnson does not dispute that he initially agreed to place Homemakers' assets into the Tiered Trust and that he signed a trustee's deed conveying the condos and townhomes. He also does not assert any injury he incurred due to the deed being recorded. Even if your allegations that the deed was deficient are somehow established in Court, it does not change the fact that Mr. Johnson agreed to the recording of a trustee's deed in the first place and suffered no harm due to the recording the deed.

Mr. Johnson has also claimed the Tiered Trust was procured by fraud because he did not understand what constituted the corpus of the trust. That is an absurd claim. Mr. Johnson signed the Tiered Trust agreement which clearly states the assets that would be included in the Tiered Trust.

Mr. Johnson should also be cognizant of the fact that he entered into the Loan Agreement without any intent to comply with it. He admitted during his deposition that he did not want to sell the condos and townhomes. As a result, the Loan Agreement was procured by fraud because the sale of the condos and townhomes and a repayment of the debt was a material term of the Loan Agreement.

In addition to the above, you ignore the fact that the bankruptcy court already ruled on ownership of Homemakers and Mr. Johnson acknowledged or failed to dispute the existence of the Tiered Trust and the assignment of his membership interest in Homemakers in those proceedings. Mr. Johnson has not acted in a manner that complies with his claim that he has an interest in Homemakers or Homemakers' assets. He took no efforts to dispute Mainstreet's Motion for Relief from the Automatic Stay filed in the bankruptcy proceedings nor has he taken any action to directly dispute Mainstreet's foreclosure claims. Indeed, he sat on his hands for over two-years since the assignment, and waited until after he was sued on his guaranty, before making a claim for his interest in Homemakers or deny the existence of the Tiered Trust.

6388205.v1

May 5, 2026
Page 3

Your letter and the asserted civil theft claim is in bad faith. Mr. Johnson has stated that he is not collectible and, assuming that is true, he believes he has nothing to lose by pursuing meritless claims. His willingness to pursue meritless claims is evidenced by the fact that a vexatious litigant motion is already pending against him. It is clear to us that Mr. Johnson is simply going after the deepest pockets and attempting to elevate a loan dispute and a failed business transaction into something nefarious to pressure, harass, and smear my clients.

Be advised, my clients will continue to protect their interests to the fullest extent of the law.

Sincerely,

*James A. Timko*

James A. Timko

JAT:mg

6388205.v1

# EXHIBIT B

## Assignment of Membership Units of Homemakers Real Estate, LLC

*Executed January 9, 2024, by Horton S. Johnson, as sole member, purporting to assign all right, title, and interest in the membership units to Crescent Sound, Limited, as Trustee of the Tiered Land Trust dated September 13, 2023.*

*In re Homemakers Real Estate, LLC*

Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

In Support of Motion to Vacate Order Dismissing Case

Pursuant to Fed. R. Civ. P. 60(b)(3)

## Assignment of Membership Units

I, Horton S. Johnson, as the sole owner and holder of all of the issued and outstanding membership units of Homemaker Real Estate, LLC, and in consideration of the loan accommodations made by PEDIXON, LLC, a Florida limited liability company, do now assign the following unto Crescent Sound, Ltd., as Trustee of the Tiered Land Trust u/t/d 9/13/2023: all of my right, title and interest in and to all of the issued and outstanding membership units of Homemakers Real Estate, LLC, a Florida limited liability company.

I have executed this assignment in Orlando, Florida on this 9th day of January 2024.

_Horton S. Johnson_
Horton S. Johnson
Manager of
Homemakers Real Estate, LLC

STATE OF FLORIDA
COUNTY OF Orange

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of __✓__ physical presence or __ online notarization on January 9, 2024, by Horton S. Johnson.

Notary Public, State of Florida
Name: Janelle Morea
(Please print or type)

Commission Number: HH077342
Commission Expires: 1/5/2025

Janelle Morea
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

Notary: Check one of the following:
_____ Personally known OR
__✓__ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: License

HSJ

# EXHIBIT C

## Declaration of Kenneth G. Dixon

*Sworn under penalty of perjury and filed June 24, 2025 as Exhibit C to Respondents'*
*Supplemental Pleading in Support of Motion to Dismiss (Doc. 69), and refiled in In re*
*Homemakers Real Estate, LLC, Case No. 6:25-bk-05570-GER, as Exhibit A to Doc. 7.*
*Paragraphs 12–14 set forth the "total/no return" representation.*

*In re Homemakers Real Estate, LLC*
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

In Support of Motion to Vacate Order Dismissing Case

Pursuant to Fed. R. Civ. P. 60(b)(3)

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

HOMEMAKERS REAL ESTATE, LLC,

      Debtor.

CASE No. 6:25-bk-02685-GER
Chapter 11

## DECLARATION OF KENNETH DIXON IN SUPPORT OF MOTION TO DISMISS BANKRUPTCY CASE FOR LACK OF CORPORATE AUTHORITY

I, KENNETH DIXON, declare as follows:

1.      I am the Managing Member of PEDIXON, LLC ("PEDIXON") and ZPD, LLC ("ZPD") and its corporate representative for the matters addressed in this Declaration.

2.      I am over 18 years of age and I am competent to make this Declaration. I am authorized to make this Declaration on behalf of PEDIXON and ZPD and based on my personal knowledge and the business records of PEDIXON and ZPD, including all of the exhibits attached to this Declaration.

3.      I am familiar with the business records which PEDIXON and ZPD regularly create and maintain. The business records attached hereto are true and accurate copies; were made by, or from information transmitted by, a person with knowledge of the facts contained in the business records made at or near the time of the acts and events appearing on them; made or compiled as part of the regular practice of PEDIXON and ZPD; and kept in the regular course of Plaintiff's regularly conducted business activities. The documents attached hereto all constitute business records of PEDIXON and/or ZPD.

4.      Horton Johnson and Homemakers Real Estate, LLC ("Homemakers") are the guarantors of several loan accommodations made by PEDIXON and ZPD to Tiered Capital, Inc.,

5735770.v1



EXHIBIT

A

its shareholders and their affiliates, including Homemakers Real Estate, LLC and Horton ("Woody") Johnson (collectively, "Tiered") made from January 2022 through October 2023 (collectively, the "Loan").

5.    In 2022, at the request of Ken Jones, the Chief Financial Officer of Tiered (the "CFO"), I began to attend meetings with Frank Amodeo ("Amodeo") at his place of residence located at 1311 Hoffner Ave, Orlando FL 32809.

6.    For the first few months, the CFO was present at these meetings. Amodeo was introduced to me as the designated representative and consultant of Tiered, and specifically, Homemakers and Johnson.

7.    Johnson was present for at least two of the meetings.

8.    Johnson's legal counsel, Baylor Johnson, was present at one of the meetings.

9.    After several months, PEDIXON's and ZPD's legal counsel, Alison Pitkanen, generally accompanied me to these meetings.

10.    During these meetings, Amodeo orchestrated and negotiated the loan accommodations between PEDIXON, ZPD, and Tiered.

11.    In December 2023, the Loan was in default, and the principal amount due was approximately $10,625,000. At this time, I instructed my legal counsel to deliver a default notice to Tiered.

12.    On January 7, 2024, I attended a meeting with Frank Amodeo to discuss alternative solutions to foreclosure and legal action against Johnson and Homemakers. At this meeting, Mr. Amodeo suggested that Mr. Johnson would be willing to relinquish all interest in Homemakers to obtain a forbearance of legal action under and enforcement of Mr. Johnson's personal guaranty. Since the Assignment was not merely collateral, and it was something new being offered, I agreed

2

5735770.v1

to forbear. The parties agreed that the Assignment would be a total assignment of the interests with no return to Johnson.

13. On January 9, 2024, I instructed my legal counsel to meet with Amodeo and Johnson to formalize the total assignment from Johnson. On that same date, Johnson executed the Assignment and in exchange therefor, PEDIXON LLC agreed to a six (6) month forbearance of the Loan. A true and correct copy of the Assignment is attached hereto as Exhibit "A."

14. I decided that the interests in Homemakers would be held in the Trust because it was a total assignment and the Trust would own Homemakers and own the beneficial interest in the Tiered Trust for the Trustee to administer to work towards paying off the Loan.

15. The Trustee has the authority to control the entity and holds the beneficiary interest of Homemakers in the Tiered Trust.

16. On or about January 24, 2025, I instructed my counsel to send another default notice to Johnson, among others. A true and correct copy of the default notice is attached hereto as Exhibit "B". In the default notice the assignment of the interests in Homemakers to obtain a forbearance was mentioned. Mr. Johnson never responded to contest the assignment of Homemakers to the Trust.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Kenneth Dixon

3

5735770.v1

# EXHIBIT D

### Summary — Dixon's Repaid by December 2023

*One-page tabular summary identifying eleven (11) extensions of credit, totaling $11,225,000, made between January 2022 and September 2023 by three Dixon-affiliated lenders (PEDIXON LLC, Parke Financial Limited Partnership, and ZPD LLC) to six (6) borrowers affiliated with Tiered Capital, Inc., and showing $11,863,595 in principal payments received (in cash and in-kind) by January 2024 — establishing that Dixon was repaid in full, with a $548,595 surplus, prior to the January 9, 2024 Assignment.*

*In re Homemakers Real Estate, LLC*

Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

In Support of Motion to Vacate Order Dismissing Case

Pursuant to Fed. R. Civ. P. 60(b)(3)

Exhibit A

# Dixon's Repaid

Between January 2022 and September 2023, three Dixon-owned lenders[1] made 11 extensions of credit to six persons[2] affiliated with the owners of Tiered Capital, Inc. (borrowers):

| Date | Description | Amount |
|------|-------------|--------|
| Jan. 2022 | Sherwood Note (Amelia CD) | 500,000 |
| July 2022 | IMQA Loan 506 | 300,000 |
| Aug. 2022 | Allonge to Sherwood Note | 250,000 |
| Aug. 2022 | Hampton | 1,300,000 |
| Oct. 2022 | Sherwood Option Loan | 500,000 |
| Dec. 2022 | Million Dollar Loan (Cherry CD) | 1,000,000 |
| Feb. 2023 | Resorts Common Area Loan | 500,000 |
| June 2023 | River Fly In | 3,000,000 |
| July 2023 | Holly Bluff | 3,000,000 |
| July 2023 | Flynn | 125,000 |
| Sept. 2023 | Tiered | 750,000 |
| | **Total** | **11,225,000** |

Between January 2022 and January 2024, the borrowers made all payments of interest and expenses; plus, either in-kind or in-cash, made $11,863,595 in payments earmarked for the payment of principal:

| Date | Description | Amount |
|------|-------------|--------|
| Jan. 2022 | ROGOs | 150,000 |
| July 2023 | 57.36 Acres of river front property | 4,210,000 |
| July 2023 | 7.24 Acres of industrial property | 4,300,000 |
| Oct. 2023 | Cash | 2,603,595 |
| Jan. 2024 | Cash from CD | 500,000 |
| | **Total** | **11,863,595** |

Despite Dixon having received all interest and expenses due through December 2023 and $548,595 more than the principal of all the loans, Dixon continued to collect monies and properties from January 2024 through to the present (April 2026). Simply, Dixon has taken more than $5,000,000 since being repaid, not including the 27 condominiums and townhomes.

---

[1] PEDixon, LLC, Parke Financial Limited Partnership, and ZPD, LLC
[2] Sherwood Construction, Inc. IMQA Investments Incorporated, Recycled group of SC, LLC, Florida Space Coast Resorts, Inc., Tiered Capital, Inc., and Martin Flynn