**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 6:25-bk-02685-GER |
| HOMEMAKERS REAL ESTATE, LLC, | ) Chapter 11 |
| | ) |
| Debtor. | ) |

---

**MOVANT'S OMNIBUS REPLY IN SUPPORT OF THE MOTIONS TO VACATE
(DOC. 88 AND DOC. 89) AND IN RESPONSE TO THE OBJECTION OF
PEDIXON LLC AND ZPD LLC (DOC. 93)**

The Movant, by and through undersigned counsel, replies in support of the pending Motions to Vacate (Doc. 88 and Doc. 89) and responds to the Omnibus Objection of PEDIXON LLC and ZPD LLC (Doc. 93, the "Objection"), and states:

The threshold concern is mootness given the order for relief in the involuntary action.[1] The other dispositive issue is one concerning legal characterization. The Objection treats the Assignment of Membership Units as an absolute, ownership-vesting transfer. But Mr. Timko, as Dixon's counsel, has represented that Dixon's intent was to return the assigned assets to Mr. Johnson once the debt was repaid — and under Florida law that admitted intent makes the Assignment a collateral assignment for security, not an absolute transfer.[2] Everything else in this case follows from that characterization. The balance of the Objection rests on three further legal arguments and one evidentiary linchpin: that the Florida Land Trust Act supplied a valid basis for the dismissal; that Rule 60 cannot reach a "tactical" choice or facts "known" at the time of dismissal; that the fraud standards of Rule 60(b)(3) and 60(d)(3) are too demanding to be met; and, factually, the sworn Declaration of Janelle Morea (Doc. 93, Ex. B) and its companion DocuSign certificate (Ex. C), offered to rebut the forgery. As set forth below, <u>the characterization issue resolves the case in the Debtor's favor; no "Tiered Land Trust" ever legally existed; the forgery is</u>

---

[1] *In re Homemakers*, No. 6:25-bk-05570 (Bankr. M.D. Fla. 2026).
[2] *In re JLK Construction, LLC*, 2025 WL 3681827, at *4 (Bankr. W.D. Mo. Dec. 18, 2025) ("Under Florida law, the parties' intent determines whether a transaction constitutes a sale or a loan." (citing *Indian Lake Estates, Inc. v. Special Investments, Inc.*, 154 So. 2d 883, 888 (Fla. 2d DCA 1963); *Griffin v. Kelly*, 92 So. 2d 515, 519 (Fla. 1957); *Foster v. Weber*, 578 So. 2d 857, 858 (Fla. 2d DCA 1991))).

now documented instrument-by-instrument; and the Morea Declaration has collapsed under a sworn complaint filed with the Florida notary regulator.

## I.   BY DIXON'S OWN ADMITTED INTENT, THE ASSIGNMENT WAS A COLLATERAL ASSIGNMENT FOR SECURITY — NOT AN ABSOLUTE TRANSFER — AND TIMKO'S DEFENSE OF DIXON CONCEDES THE POINT THAT DEFEATS THE DISMISSAL.

This is the first and primary issue before the Court, because it determines the legal nature of the entire transaction and, with it, the validity of the dismissal. Under Florida law, the character of an assignment or conveyance is fixed by the **intention of the parties**, not by the label the instrument happens to wear. The Legislature has so commanded: "All conveyances… or other instruments of writing conveying or selling property, either real or personal, **for the purpose or with the intention of securing the payment of money**, whether such instrument be from the debtor to the creditor or from the debtor to some third person in trust for the creditor, shall be deemed and held mortgages." Fla. Stat. § 697.01(1). The Florida Supreme Court has enforced that rule for more than a century: "Neither artifice of form nor superficial declaration of intention will successfully obscure the true nature of the transaction." *Gollnick v. Barker*, 94 Fla. 885, 114 So. 527 (1927). The "controlling question is the intention of the parties," found "from the entire transaction and circumstances, not just the conveyance instrument itself," and "in doubtful cases" the instrument is construed to be a mortgage. *McLendon v. Davis*, 131 So. 2d 765 (Fla. 1st DCA 1961); accord *Marcus v. Hull*, 142 Fla. 306, 195 So. 170 (1939); *Brumick v. Morris*, 131 Fla. 46, 178 So. 564 (1938); *Barr v. Schlarb*, 314 So. 2d 609 (Fla. 4th DCA 1975) (§ 697.01 "permits construing an instrument as a mortgage even if it appears otherwise on its face").

Here, the controlling intent is not in dispute — because Dixon's own counsel has admitted it. Mr. Timko has represented that Dixon's intent was to **return** the assigned assets to Mr. Johnson upon repayment of the debt; the May 5, 2026 letter attached to Doc. 89 (Ex. A) concedes that the Assignment "would have been returned." An assignment made with the intention that the asset revert to the assignor upon satisfaction of a debt is, by definition, an assignment for collateral purposes — a security interest, not an outright sale. That is precisely the transaction § 697.01 "deem[s] and held [a] mortgage." On Dixon's own stated intent, the Assignment of Membership Units in Homemakers was a collateral assignment securing the September 2023 loan, and nothing more.

Mr. Timko cannot have it both ways. To shield Dixon from the civil-theft demand, the Objection now suggests that it is unremarkable for a party to harbor a subjective intent different from the written agreement. That suggestion is wrong as a matter of law: under § 697.01 and the authorities above, intent does not yield to the form of the writing — it controls over it, and a recital that an instrument is an absolute conveyance does not make the conveyance absolute "when it may be shown to have been executed for the purpose or with the intention of securing the payment of money." *Connor v. Connor*, 59 Fla. 467 (1910) ("once a mortgage always a mortgage"). More fundamentally, the argument is self-defeating. The very intent Mr. Timko invokes to absolve Dixon of theft — that Dixon meant to return the assets once the loan was repaid — is the statutory hallmark of a security transaction. Counsel cannot simultaneously invoke Dixon's benign intent-to-return to defeat the theft accusation and insist that the Assignment was an absolute transfer that vested ownership. The first concession proves the second false: if Dixon's intent was to return, the Assignment was collateral; and if it was collateral, Dixon and his entities are at most secured creditors, not owners.

The consequence is sharper still because the debt has been paid. The record establishes that Dixon was repaid in full before the Assignment was ever recorded — approximately $11,225,000 advanced against $11,863,595 repaid, a surplus of roughly $548,595. (Doc. 89, Ex. D.) A collateral assignment secures a debt; when the debt is satisfied, the security is discharged and the collateral reverts to the assignor as a matter of law, and the assignor's equity of redemption cannot be cut off by the form of the instrument. A creditor who has been paid in full and nonetheless retains and records an assignment of the collateral does not hold an absolute transfer; he holds property that equity requires him to return.

The Debtor's reconciliation, submitted as Exhibit D to Doc. 89, lays this out plainly. Between January 2022 and September 2023, three Dixon-owned lenders made eleven extensions of credit to the borrowers totaling $11,225,000:

| Date | Description | Amount |
| --- | --- | --- |
| Jan. 2022 | Sherwood Note (Amelia CD) | 500,000 |
| July 2022 | IMQA Loan 506 | 300,000 |
| Aug. 2022 | Allonge to Sherwood Note | 250,000 |
| Aug. 2022 | Hampton | 1,300,000 |
| Oct. 2022 | Sherwood Option Loan | 500,000 |
| Dec. 2022 | Million Dollar Loan (Cherry CD) | 1,000,000 |

| Feb. 2023 | Resorts Common Area Loan | 500,000 |
|---|---|---|
| June 2023 | River Fly In | 3,000,000 |
| July 2023 | Holly Bluff | 3,000,000 |
| July 2023 | Flynn | 125,000 |
| Sept. 2023 | Tiered | 750,000 |
| **Total** | | **11,225,000** |

Between January 2022 and January 2024, the borrowers paid all interest and expenses and made $11,863,595 in payments earmarked to principal — in cash and in kind:

| Date | Description | Amount |
|---|---|---|
| Jan. 2022 | ROGOs | 150,000 |
| July 2023 | 57.36 acres of river-front property | 4,210,000 |
| July 2023 | 7.24 acres of industrial property | 4,300,000 |
| Oct. 2023 | Cash | 2,603,595 |
| Jan. 2024 | Cash from CD | 500,000 |
| **Total** | | **11,863,595** |

Dixon thus received $548,595 more than the principal of all eleven loans, with every dollar of interest and expense satisfied through December 2023. Yet he continued to collect — by his own admission, more than $5,000,000 since being repaid, not counting the 27 condominium and townhome units. (Doc. 89, Ex. D.)

Had this characterization been resolved — as § 697.01 requires it to be resolved, on intent — the Court would have had before it a secured-creditor relationship, not an ownership transfer. PEDIXON and ZPD would stand as creditors; Crescent Sound, Ltd. would be, at most, the trustee of a mortgage; and the Debtor would retain its membership units and its equity, free to proceed with its case. That is the Debtor's original position, and it is the position Florida law compels once Dixon's admitted intent is taken at face value. The dismissal, however, proceeded on the opposite premise — that an absolute transfer had stripped the Debtor of its interests and vested ownership in the Dixon/Crescent Sound structure. That premise is irreconcilable with Dixon's own admitted intent and with § 697.01, and its correction is a textbook basis for relief under Rule 60(b)(1) (mistake of law). (The same admission also supplies an independent ground under Rule 60(b)(3); see Section IV below.)

## II.   THE COURT MISAPPLIED THE FLORIDA LAND TRUST ACT BECAUSE NO "TIERED LAND TRUST" EVER LEGALLY EXISTED — A FURTHER MISTAKE OF LAW UNDER RULE 60(b)(1).

Parties cannot will a Florida land trust into existence by saying so. A land trust is a creature of statute, Fla. Stat. § 689.071, and it arises only when the statutory formalities are satisfied — a recorded instrument vesting title in a trustee, coupled with the powers and beneficial-interest structure the statute prescribes. A recital, an acknowledgment, or the parties' shared assumption that a trust exists is not a substitute for the statute. The label does not create the thing.

Here, the "Tiered Land Trust" was treated below as an established legal entity holding title to the Homemakers condominium units. It was nothing of the kind. The only instrument said to have placed the units "in trust" — the Trustee's Deed dated September 13, 2023 — was, in its executed form, a three-page DocuSign document bearing no witnesses, no notarial acknowledgment, and no legal descriptions. On its face it was incapable of conveying Florida real property and incapable of vesting title in any trustee. An instrument that cannot convey title cannot fund a land trust. The trust res was empty; the trust did not exist.

That matters dispositively to the dismissal. The Court applied the Florida Land Trust Act — and the consequences that flow from a beneficiary's or trustee's authority under it — to an entity that the governing statute never brought into being. Applying a statute to a non-existent trust is a mistake of law, and a mistake of law by the Court is precisely the ground that Rule 60(b)(1) exists to correct. See Fed. R. Civ. P. 60(b)(1) (made applicable by Fed. R. Bankr. P. 9024); *Kemp v. United States*, 596 U.S. 528 (2022) (a "mistake" under Rule 60(b)(1) includes a legal error by the court). The Objection's reliance on *In re Mulig* is misplaced: this is not a litigant's second-guessing of strategy, but a request that the Court correct its own legal premise that a statutory trust existed when the statute's requirements were never met.

## III.   THE FORGERY IS NOW DOCUMENTED, AND THE OBJECTION'S SOLE REBUTTAL — THE MOREA DECLARATION — IS PERJURIOUS.

The Objection does not, and cannot, dispute the documentary record of forgery on its own terms. Instead, it offers a single counterweight: the sworn Declaration of Janelle Morea (Doc. 93, Ex. B), the notary whose seal appears on the recorded Trustee's Deed and the related instruments, together with a DocuSign certificate (Ex. C). The entire objection therefore rises or falls with Ms. Morea's credibility. It falls.

*A.   Who Ms. Morea is, and how she came to hold the pen.*

Ms. Morea's history is directly relevant to the weight her Declaration can bear. In August 2021, she came up through the Amodeo-affiliated "Correcting Injustice" orbit, where she was admonished by Frank Amodeo for notarizing documents without the signer's presence — the very practice at issue here. She then went to the Sherwood/Flynn entities, and there raised — through Alison Pitkanen — sexual-discrimination complaints against Ken Jones, a Tiered Capital officer, after which she was moved into the Tiered human-resources function, and now functions as an instrument of Kenneth G. Dixon and the PEDIXON/ZPD interests that authored the Objection. Her Declaration is not the disinterested recollection of a neutral notary; it is the statement of a person who has been positioned, repeatedly, to serve whoever needed the documents.

*B.   Ms. Morea worked at the direction of Alison Pitkanen — and the contemporaneous record proves it.*

The pivotal sworn assertion in the Morea Declaration is that she "did not take directions from Ms. Pitkanen regarding notarizing signatures or any other matter related to [her] job." That statement is contradicted by Ms. Morea's own words and by Ms. Pitkanen's, in writing, contemporaneously:

1. **LinkedIn / employment.** Ms. Morea's own LinkedIn profile reflects her working relationship within the Pitkanen-affiliated operation. (Notary Compl. Ex. I.)

2. **Email control.** Ms. Morea sent notary-related correspondence from and "on behalf of Alison Pitkanen Law Firm LLC" using the firm's alisonplaw@gmail.com account. (Notary Compl. Exs. F, E.)

3. **Direction to notarize.** Ms. Pitkanen wrote directly to Ms. Morea on August 1, 2023: "Janelle, 1. Did you notarize these? If not, can you? 2. After notarizing, please record the mortgage in Orange County… There are funds in my 1542 account to pay the doc stamps and intangible tax on the mortgage." Ms. Pitkanen then confirmed to Mr. Amodeo: "FYI — I asked Janelle to take care of this. She has a Simplifile account set up with my information for recording." (Notary Compl. Ex. G-2.)

4. **Routing of the Homemakers instrument itself.** On January 9, 2024, Ms. Pitkanen's assistant directed Ms. Morea to notarize "the document to notarize" — the Assignment

of Membership Units in Homemakers, the very instrument later placed before this Court. (Notary Compl. Ex. G-3.)

5. **Pitkanen's own admission.** Ms. Pitkanen acknowledged in a contemporaneous text message that "Janelle assists Alison with TITLE work. Only title work," and that the documents were converted to PDF and "sent… to her for Marty's execution." (Notary Compl. Ex. H.)

Ms. Morea's sworn denial that she took direction from Ms. Pitkanen cannot survive Ms. Pitkanen's own contemporaneous instruction to "notarize these" and "record the mortgage," funded out of Pitkanen's account and recorded through a Simplifile credential set up in Pitkanen's name. A declarant who swears the opposite of the contemporaneous written record is not a witness whose say-so can defeat a Rule 60 motion.

### C.  Ms. Morea was not authorized to perform online notarizations until September 13, 2025 — which makes the recited acknowledgments physically impossible.

The single most important fact for present purposes is regulatory and undisputed. The Florida Department of State confirmed in writing, on November 25, 2025 (Andrea J. Parishani, Section Supervisor), that Ms. Morea's Remote Online Notarization authorization did not issue until **September 13, 2025**. (Notary Compl. Exs. B-1, B-2, B-3.) Before that date she had no authority to perform any notarial act remotely by audio-video means.

Yet the acknowledgments on which the Objection relies recite events that occurred years earlier and at a distance, by electronic execution:

1. The **14556 Saint Georges Hill Drive Mortgage** (executed by DocuSign on July 28, 2023, with the notarial block entirely blank on the executed copy) was recorded on August 2, 2023 with a fully completed Morea acknowledgment grafted onto it, reciting personal presence that never occurred. (Notary Compl. Exs. L-1, L-2.)

2. The **Trustee's Deed** exists in three sequential versions, all bearing the identical DocuSign Envelope ID 9078288B-FE20-4A15-A658-110FB6D3929D: Version 1 (DocuSign final, no witnesses, no notary, "26 UNITS" with no legal descriptions); Version 2 (Morea acknowledgment and witness signature added after the fact, still 26 units); and Version 3 (recorded February 14, 2024 as CFN 2024031262, OR Book

9992, Page 2830, Brevard County — now eight pages, with six pages of 27-unit legal descriptions substituted in and witness addresses added). An identical envelope ID across three materially different documents is a technical impossibility unless the document was rebuilt after execution. (Notary Compl. Exs. M-1, M-2, M-3.)

3. The **River Fly In Security Pledge Agreement** is the clearest forensic illustration: Version 1 (DocuSign Envelope ID FA265EF5-31FC-48FE-A327-47C1E98C5BC9, October 30, 2023, Flynn-only, five pages) bears no notary block at all; a sixth "jurat" page reciting an October 30, 2023 oath was later grafted on with no envelope ID; and the document was then re-enveloped, producing an entirely new Envelope ID 545249E8-5982-4DFA-92C0-E713A3E9775F across all pages — with Mr. Dixon's signature now added. A DocuSign envelope ID is assigned at the instant an envelope is created; a new ID can only mean the document was rebuilt long after the recited execution date. (Notary Compl. Exs. N-1, N-2, N-3.)

Because Ms. Morea had no online-notarization authority until September 13, 2025, every acknowledgment she executed before that date on a remotely-executed instrument was, as a matter of Florida law, an unauthorized and false notarial act. See Fla. Stat. §§ 117.05(4)(c), 117.05(5), 117.225, 117.265; see also id. § 117.05(12) (self-notarization bar, violated in the related Le Lourec affidavit of April 5, 2023). The DocuSign certificate offered as Exhibit C does not cure this; it confirms the documents were executed electronically and at a distance, which is exactly what makes the in-presence recitals false.

### D.  *The Morea Declaration is now the subject of a sworn complaint to the Florida regulator.*

On June 3, 2026, Martin C. Flynn, Jr. executed and submitted a Sworn Complaint Against a Florida Notary Public to the Notary Section of the Executive Office of the Governor (copy to the Department of State, Notary Public Section). The complaint sets out, with exhibits, the unauthorized remote notarizations from January 2022 through September 13, 2025; the self-notarization of the Le Lourec affidavit; the signature-stamp "acknowledgments" of Mr. Flynn's signature; the post-execution grafting of acknowledgments onto the 14556 mortgage; the three-stage progressive forgery of the Trustee's Deed; and the re-enveloped River Fly In jurat. The same conduct that the Objection asks this Court to accept as a valid notarial act is now formally alleged to the State as a basis to suspend or revoke Ms. Morea's commission and let the statute speak under

Fla. Stat. §§ 117.105, 831.01, and 831.02. The Court should not credit a declaration that the declarant's own contemporaneous emails, the State's own RON records, and a pending sworn complaint all contradict.

## IV.  THE OBJECTION MISUNDERSTANDS RULE 60: IT IS NOT AN APPEAL SUBSTITUTE, AND THE DISMISSAL WAS ENTERED WITHOUT FUNDAMENTAL FAIRNESS.

The Objection repeatedly characterizes the Motions to Vacate as an improper substitute for an appeal, and insists the relevant facts were "known" and the dismissal a "tactical choice." That argument misconceives both the function of Rule 60 and what actually happened below.

First, Rule 60 is not an appeal substitute — but an appeal presupposes a developed record on which error can be reviewed. There was no such record here. The forgery and the notarial defects were not litigated and decided; they were concealed. One cannot appeal a factual record that the opposing parties' attorneys prevented from being made. Rule 60(b) and 60(d)(3) exist precisely for the situation in which the integrity of the proceeding itself — not merely the correctness of a ruling — is in question. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944); *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). Here, counsel had Mr. Dixon make a false declaration and perjure himself in testimony.

Second, a dismissal entered against a party must be entered in a proceeding conducted under the ordinary rules of fair play. A default or dismissal procured while the moving parties were tendering forged instruments and an unauthorized notary's false acknowledgments is not the product of fair play; it is the product of a cloud of deception maintained by counsel. The dismissal here suffered from independent defects: it applied the wrong legal rules (treating a collateral assignment as an absolute transfer, see Section I, and applying the Land Trust Act to a trust that did not exist, see Section II), and it was obtained against the backdrop of documents the proponents knew or should have known were fabricated (see Section III). A judgment so obtained lacks the fundamental fairness on which finality depends, and Rule 60 is the vehicle to set it aside.

Third, the "known at the time" and "tactical choice" arguments fail on their own facts. The dispositive regulatory fact — that Ms. Morea had no RON authority until September 13, 2025 — was confirmed by the Florida Department of State only on November 25, 2025, well after the dismissal. The reconstruction of the River Fly In agreement under a new DocuSign envelope ID,

and the instrument-by-instrument forensic comparison, likewise post-date the dismissal. These are not facts the Movant sat on; they are facts the proponents' own conduct kept hidden until the documentary and regulatory record was assembled.

Fourth, the Objection's own words confirm the fraud it seeks to wave away. Counsel for PEDIXON and ZPD has now conceded — in the May 5, 2026 letter attached to Doc. 89 — that the Assignment "would have been returned" to Mr. Johnson, directly contradicting the sworn assertion in the Dixon Declaration (Doc. 69, ¶¶ 11–14) that there was "no return." As shown in Section I, that admission is doubly damaging: it recharacterizes the Assignment as collateral, and it establishes a material misrepresentation. And the Objection itself, at footnote 6, retreats from the civil-theft demand by admitting its language "should have been more precise." These are party-opponent admissions, Fed. R. Evid. 801(d)(2)(B), (D), and prior inconsistent statements, Fed. R. Evid. 613(b). Loose lips have confirmed what the documents already show: the declaration the proponents prepared for their client was false, and the misrepresentation was material to the relief the Court granted. That is the heartland of Rule 60(b)(3). See *Cox Nuclear Pharmacy, Inc. v. CTI, Inc.*, 478 F.3d 1303 (11th Cir. 2007).

The Objection's remaining authorities do not compel a different result. *Travelers Indem. Co. v. Gore*, 761 F.2d 1549 (11th Cir. 1985); *Mills v. Commissioner, Alabama Dep't of Corrections*, 102 F.4th 1235 (11th Cir. 2024); and *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338–39 (5th Cir. 1978) recite the (concededly demanding) fraud-on-the-court standard, but that standard is met where, as here, an officer of the court's notarial seal and a party's sworn declaration are shown to be fabricated — the standard is high, and the proof here is higher. *Padilla v. Redmont Properties, LLC*, 53 F.4th 1303 (11th Cir. 2022), is inapposite: it holds only that a Rule 60 motion must actually seek to set aside the judgment — not affirmative relief against a non-party — which is precisely what the Movant seeks here in moving to vacate the order of dismissal. The Objection's remaining theory — mootness — is addressed in Section V.

## V.   THE MOTIONS ARE NOT MOOT: VACATUR IS THE VEHICLE TO RECOVER MORE THAN $274,000 IN HOMEMAKERS REVENUES DIVERTED TO PEDIXON THAT THE LATER FILING DATE CANNOT REACH.

A matter is moot only when the court can no longer grant any effective relief. That is the opposite of this case. The relief the Movant seeks — vacatur of the dismissal, reinstatement, and

an evidentiary hearing — is not abstract; it unlocks a concrete, quantifiable recovery for the estate that exists today and grows each month. The vacatur of the dismissal order and reopening of this case permits the recovery of at least $274,224.20 in preferential payments and $250,000 in real estate equity.

The record establishes that Crescent Sound, Ltd. directed Homemakers' operating revenues — the monthly "Beachside" distributions generated by the Cape Crossing rental operations — **directly to PEDIXON** rather than to the Debtor. The Debtor's own revenue accounting itemizes those diversions, month by month, beginning January 30, 2024 and continuing through the present, and totaling **at least $2,077,472.26**[3]. (See Debtor's schedule, "Homemakers Revenues Diverted to PEDIXON.") And Mr. Johnson believes approximately $500,000 more exists outside the verified accounting. Every one of those dollars is property the estate is entitled to pursue — and, as Section I shows, because PEDIXON is at most a secured creditor and not an owner, those distributions are payments to a creditor, squarely within the estate's avoidance powers, not an owner collecting its own rents.

Whether and how far those diversions can be recovered turns directly on the petition date — which is precisely why the Rule 60 relief is not moot. Transfers of estate property made after the petition date are recoverable as unauthorized post-petition transfers under 11 U.S.C. § 549; transfers made within the 90-day window before the petition (or, for an insider, the one-year window) are recoverable as preferences under 11 U.S.C. § 547. The voluntary Chapter 11 (Case No. 6:25-bk-02685) was filed on May 5, 2025; the later involuntary case (Case No. 6:25-bk-05570) was not filed until September 2, 2025. Because the insider preference look-back runs one year from the petition date, restoring the earlier May 5, 2025 filing reaches transfers back to May 5, 2024, while the September 2, 2025 involuntary filing reaches only to September 2, 2024. The difference is decisive: the Beachside diversions for May, June, July, and August 2024 — totaling $274,224.20 — are within the estate's preference reach only if the earlier 02685 petition date is restored; under the later filing they fall outside the one-year window and are lost.

---

[3] Once more noting that if those funds had not been raided, then every Homemakers debt would be current and all non-insider debts paid. Particularly egregious since at the time of the diversion Dixon had already received cash and property worth more than all the debts owed by all the borrowers. Mr. Johnson emphasizes Homemakers never borrowed or received a single dollar from any Dixon lender.

Vacating the dismissal (Doc. 73) and reinstating Case No. 02685 is therefore the vehicle that preserves the earlier petition date and the additional preference reach that comes with it. Because the choice between vacatur and dismissal changes the property the estate can recover — by $274,224.20 in additional reachable diversions, atop the more than $2 million already documented — the controversy is emphatically live. *Soliman v. U.S. ex rel. INS*, 296 F.3d 1237 (11th Cir. 2002), concerned a genuinely dead controversy in which no relief remained to be granted; this controversy is the opposite, and the relief sought is concrete and measurable.

**CONCLUSION**

The transaction was, by Dixon's own admitted intent, a collateral assignment for security — and the debt it secured has been paid in full. The Court applied a statute to a trust that never existed; the forgery is now documented instrument-by-instrument; and the Objection's only rebuttal is a declaration the declarant's own emails, the State's RON records, and a pending sworn complaint all expose as false. Far from moot, the case presents a live controversy over more than $2 million in Homemakers revenues diverted to PEDIXON, including $274,224.20 in 2024 distributions that the estate can reach only if the earlier petition date is restored. The Movant respectfully requests that the Court grant the Motions to Vacate (Doc. 88 and Doc. 89), vacate the order of dismissal, reinstate the case, set an evidentiary hearing at which Kenneth G. Dixon and Frank L. Amodeo may be examined, and grant such further relief as is just.

Respectfully submitted this 5th day of June, 2026

/s/ Matthew A. Leibert
Matthew A. Leibert, Esq.
Florida Bar No. 0752266
Urban Thier & Federer, P.A.
5782A S. Semoran Blvd.
Orlando, FL 32822
Telephone: (407) 579-8355
Email: leibert@urbanthier.com
Counsel for Movant

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 5, 2026, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will serve electronic notice on all counsel of record, including James A. Timko, Esq., counsel for PEDIXON LLC and ZPD LLC.

/s/ Matthew A. Leibert
Matthew A. Leibert, Esq.